## COMMONWEALTH *vs.* ERIC BROWN.

Suffolk. February 9, 2007. - August 29, 2007.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Mental Impairment. Insanity. Due Process of Law,* Competency to stand trial. *Practice, Criminal,* Competency to stand trial, Required finding, Admissions and confessions, Voluntariness of statement, Voir dire, Instructions to jury, Empanelment of jury, Capital case. *Homicide. Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions, Relevancy and materiality, Voluntariness of statement, Sanity, Medical record. *Intoxication. Jury and Jurors.*

In the record of proceedings to determine a criminal defendant's competence to stand trial, no support appeared for the defendant's assertion that the trial court judge declined to order a necessary evaluation out of a desire to avoid delay or to punish the defendant [758-760]; in addition, the judge's refusal to order the production of cumulative evidence did not render the hearing constitutionally inadequate [760-761], and the judge's substantive conclusion that the defendant was competent to stand trial was supported by credible evidence [761].

At a murder trial, the judge properly denied the defendant's motions for required findings of not guilty, where, based on the evidence in the Commonwealth's case-in-chief, it was both reasonable and probable for the jury to find beyond a reasonable doubt that the defendant had murdered both victims, and that he did so with deliberate premeditation. [761-762]

At a murder trial, testimony from a police witness that the defendant, following interrogation by police, had nothing further to add merely indicated that the defendant's statement was complete, and did not constitute impermissible evidence of the defendant's postarrest silence [762-763]; further, the prosecutor's questioning of the Commonwealth's rebuttal expert did not lead to an impermissible inference that the defendant's exercise of his right to remain silent was inconsistent with his insanity defense, but rather properly focused on the defendant's apparent comprehension of the content of what the police officer had said to him, and as such was relevant to the question of his sanity [763-764].

At a murder trial at which the defendant raised an insanity defense, the judge's failure, during the defense case, to hold a voir dire on the voluntariness of the defendant's statements that had been admitted during the Commonwealth's case-in-chief did not deprive the defendant of a fair trial, where, to the extent that the voluntariness of the statements became a live issue after their admission, the judge properly submitted the voluntariness issue to the jury by providing the humane practice instruction [764-767]; moreover, the judge did not err in finding that the Commonwealth had met

its burden of proving the voluntariness of the statements beyond a reasonable doubt [767-768].

The evidence at a murder trial did not warrant or require an instruction on voluntary intoxication, and the judge did not err in declining to give it. [768-769]

At a murder trial, the judge's refusal to admit in evidence the defendant's psychiatric records, which were cumulative of the extensive evidence already presented by the defendant concerning his mental condition, did not constitute an abuse of discretion or violate the defendant's constitutional right to present a defense. [769-770]

At a criminal trial, the judge's systematic exclusion of college students from the jury without individualized findings of hardship, although improper, did not create a substantial likelihood of a miscarriage of justice. [770-772]

No reason appeared on the record of a murder trial for this court to exercise its power under G. L. c. 278, § 33E. [772-773]

INDICTMENTS found and returned in the Superior Court Department on August 5, 1996.

A pretrial hearing on the issue of the defendant's competency was had before *James D. McDaniel, Jr.*, J., and the case was tried before him.

*James L. Sultan* for the defendant.

*Donna Jalbert Patalano*, Special Assistant District Attorney, for the Commonwealth.

CORDY, J. During the early hours of June 16, 1996, Athos Oliveira and Thomas Meyer, while walking separately along Appleton Street in the South End section of Boston, encountered an assailant fitting the description of the defendant, Eric Brown. Each was shot at close range with a shotgun. Both men died almost instantly from severe wounds to the face and neck. Ten days later, police in Lincoln stopped an automobile driven by Brown. Inside the car they found the shotgun that had fired the spent shell casings found near the victims' bodies.

After his arrest, Brown underwent extensive psychiatric evaluation and spent several years at Bridgewater State Hospital (Bridgewater) before finally being found competent to stand trial in March, 2001. A jury found him guilty on two indictments charging murder in the first degree, each on the theory of deliberate premeditation.[1]

On appeal, Brown contends that he was incompetent to stand

---

[1]Brown was also found guilty of illegal possession of a shotgun and ammunition.

trial and that the Commonwealth's evidence was insufficient to prove his guilt beyond a reasonable doubt. Brown also assigns legal error to various aspects of his trial. These include claims that (1) the prosecutor improperly introduced evidence of Brown's purported postarrest silence, (2) the judge improperly failed to hold a voir dire to determine the voluntariness of certain statements made by Brown, (3) the judge improperly declined to give the jury an instruction on intoxication, (4) the judge improperly excluded from evidence certain Bridgewater medical records, and (5) the judge improperly and systematically excluded students from the jury. Finally, Brown seeks relief under G. L. c. 278, § 33E, noting particularly the extensive evidence that he suffered a mental disease at the time of the killings. We affirm.

1. *Procedural background.* On August 5, 1996, a grand jury returned four indictments against Brown, charging him with murder in the first degree for the killings of Athos Oliveira and Thomas Meyer, G. L. c. 265, § 1; unlawful possession of a dangerous weapon, G. L. c. 269, § 10 (a); and unlawful possession of ammunition, G. L. c. 269, § 10 (h).

After his arrest, Brown was sent to Bridgewater for evaluation pursuant to G. L. c. 123, § 18 (a).[2] Following a hearing held on April 9, 1998, he was found not competent to stand trial and committed to Bridgewater under G. L. c. 123, § 16 (b).[3] This commitment was periodically renewed by various judges in the Superior Court. In January, 2001, approximately two months prior to the scheduled trial date, a report was filed with the court pursuant to G. L. c. 123, § 15 (a),[4] concluding that Brown's symptoms were "under good control due to his compliance with his medication regimen and treatment at Bridgewater State Hospital," but that he could be "at risk for becoming more symptomatic as his trial approaches." The judge brought

[2]General Laws c. 123, § 18 (a), provides that a person confined in a place of detention may be transferred to a mental health facility if he is in need of hospitalization because of mental illness.

[3]General Laws c. 123, § 16 (b), allows for the commitment of a defendant found to be incompetent to stand trial.

[4]General Laws c. 123, § 15 (a), permits a judge to order a psychological examination when there is a doubt about the defendant's competency to stand trial.

Brown into court and held a hearing at which he concluded that Brown was competent to stand trial.[5] See G. L. c. 123, § 15 (*d*). As a precaution, the judge ordered that a further evaluation of Brown, pursuant to § 15 (*a*), be performed by the court clinical psychologist on March 7, 2001, the day that the trial was scheduled to begin.

On March 7, defense counsel submitted to the court a report of a private forensic psychiatrist stating that Brown was no longer compliant with his medication regimen and was not competent to stand trial.[6] The judge then ordered that Brown be further evaluated by the court clinical psychologist, who also opined that Brown was incompetent to stand trial. The judge continued the trial and ordered that Brown be evaluated by the Commonwealth's psychologist. That psychologist's evaluation report was filed on March 9, and a competency hearing was held over four days during the period March 12 through March 21.[7] At the competency hearing, a psychiatrist retained by the Commonwealth opined that Brown "ha[d] the sufficient ability to consult with his attorney with a reasonable degree of rational understanding and that he ha[d] a rational as well as a factual understanding of the court proceedings" and that therefore he was competent to stand trial. The defense called three witnesses, including a psychiatrist who testified that Brown was not competent to stand trial.[8]

The judge issued a written ruling finding Brown competent to stand trial on March 23, 2001.[9] On that same day, the trial

---

[5]Brown then filed a petition under G. L. c. 211, § 3, for review of the competency finding. A single justice of this court denied the petition.

[6]On the same day, defense counsel informed the court that on or about February 16, 2001, Brown had voluntarily stopped taking his prescribed medications.

[7]On March 14, 2001, a hearing was held in Brockton District Court pursuant to *Rogers* v. *Commissioner of the Dep't of Mental Health*, 390 Mass. 489, 494-499 (1983), at which a District Court judge determined that Brown was not competent to make medical decisions and ordered that Brown resume taking his medications. Brown resumed taking his medications following the hearing.

[8]The other two witnesses called by Brown were staff members at Bridgewater who testified that Brown was suffering from schizophrenia but did not provide opinions whether he was competent to stand trial.

[9]Further details of the competency proceedings are discussed, *infra*, in our

began. After four weeks of trial, the jury returned verdicts of guilty on all four indictments. Brown was sentenced to consecutive terms of life on the murder convictions and to from two and one-half to five years for unlawful possession of a dangerous weapon to be served concurrently with one of the life sentences.[10] The ammunition conviction was placed on file with Brown's consent.

2. *Facts.* Based on the evidence at trial, the jury were warranted in finding the following facts. On the morning of Saturday, June 15, 1996, Brown asked his friend Dwight Bobbitt, a security guard who possessed a firearms identification card, to purchase a shotgun for him.[11] Brown told Bobbitt that he needed the gun "for business." Brown gave Bobbitt $280 cash,[12] and the two men boarded a bus to travel from the Roxbury neighborhood of Boston to the Bob Smith's Sporting Goods store in downtown Boston. Brown told Bobbitt that he would look at the guns, then point at the one he wanted and say "that's the freshest, that's the one I want."

When the two arrived at the store, they went to the gun department. As Bobbitt looked at a particular shotgun, Brown told him, "that's the freshest." Brown walked away, and Bobbitt approached the salesman and purchased the gun, a "Mossberg 500" twenty-gauge shotgun with an eighteen inch barrel,[13] along with one box of ammunition,[14] at a total cost of $268.21. Brown and Bobbitt then took a taxicab back to Roxbury. When

consideration of Brown's challenge of the finding.

[10]Although he imposed sentence to be served at the Massachusetts Correctional Institution at Cedar Junction, the judge recommended that the defendant remain at Bridgewater for observation relative to his physical and mental safety. Cf. *Commonwealth* v. *Alfonso*, ante 738 (2007).

[11]Bobbitt testified that on Saturday, June 15, 1996, he had no trouble understanding what Brown said to him; nor did Brown seem to have trouble understanding him.

[12]Earlier on Saturday, June 15, 1996, Brown had cashed a paycheck dated June 13, 1996, for $297.17 at All Checks Cashed in Roxbury.

[13]The shotgun operated by a "pump action." A tube below the barrel would hold several shells. The shooter would introduce a shell into the chamber by pulling a grip along the barrel and then fire by pulling the trigger. When the grip was pulled again, the used casing would be ejected to make room for the next shell.

[14]The box of ammunition contained twenty-five twenty-gauge shotgun shells.

they parted so that Bobbitt could go to work, Brown took the shotgun and ammunition with him. Bobbitt told Brown to remove the serial number from the gun with a file because he would report the gun stolen in two weeks.[15]

When Bobbitt returned home from work after midnight, he found Brown in the company of two friends outside Brown's residence in Roxbury. Brown brought the shotgun outside, fired it into the air three or four times, and picked up the spent shell casings. Brown then went inside, came back outside, fired the gun into the air again, and then went back inside. Responding to a call reporting shots fired, two Boston police officers arrived at Brown's residence at about 2 A.M. When questioned by police, Bobbitt and the others denied having heard any shots. The officers then left. Fifteen minutes later, Brown came outside again. He was wearing a thigh-length green jacket and black boots. Brown pulled the shotgun out from under his jacket and again fired it into the air three times. He then left on foot, heading in the direction of the South End.

It was warm, and despite the early hour, people on Appleton Street were outside socializing and walking about. Among them was Athos Oliveira, who had driven to the South End from his home in Somerville. At approximately 3:30 A.M., a man approached Oliveira in front of 106 Appleton Street, pointed a shotgun at him, and fired twice. The first shot grazed Oliveira's head, taking off his cap and shredding its bill. The second shot was a direct hit to Oliveira's face and neck. He was killed almost instantly.

The man then ran down Appleton Street toward the intersection with Dartmouth Street. A group of men getting out of an automobile parked along Dartmouth Street saw the shooter approach them, hesitate, then continue down Appleton Street. The assailant soon encountered Thomas Meyer, who was standing across from 131 Appleton Street. Meyer was dressed in a black tuxedo because he had attended a friend's wedding reception in the Back Bay section of Boston earlier that evening. The assailant fired a single shot into the back of Meyer's head, killing

---

[15]Bobbitt did subsequently report the gun stolen, telling the police that his brother had taken it. At trial, he admitted that this was false.

him instantly.[16] He then continued down Appleton Street, heading toward West Canton Street.

Witnesses who observed the man who shot Oliveira and Meyer described him as a black male with Afro-style hair wearing a thigh-length green jacket. This general description matched that of Brown. Police investigators responding to the scene also found several spent shotgun shell casings near where the bodies of Oliveira and Meyer lay.[17] A ballistics expert later determined that all of the shells had been fired from the same shotgun.

It is unclear where the assailant went after he shot Meyer and continued down Appleton Street. The next witness to report seeing Eric Brown was Bobbitt. They met in front of Brown's residence sometime on the morning of Sunday, June 16, 1996. Bobbitt asked him if he had heard about the killings in the South End that had occurred earlier that morning. Brown said, "No. Why you asking me. Do I look like that type?" Bobbitt testified that during this exchange Brown did not appear to have any problem understanding what he was saying; nor did Bobbitt have trouble understanding Brown.

Ten days later, at approximately 3:25 A.M. on June 26, 1996, a police officer in Lincoln observed a van driving erratically along an otherwise quiet two-lane road. The officer stopped and approached the van. Brown was in the driver's seat, alone in the vehicle. Music was blaring from the radio. Without prompting, Brown presented the officer with an expired Rhode Island driver's license.[18] Brown would not, however, make eye contact with the officer, nor did he respond to a request that he turn down the radio's volume. When asked where he was coming from, Brown told the officer that he had taken two girls from a party in Cambridge to Winchester, and was now returning home.

The officer became concerned for his safety and called for backup. When another officer arrived, Brown was asked to step

[16]A ballistics expert later determined that the shots at both Athos Oliveira and Thomas Meyer were fired at a range of from six to eight feet.

[17]One shotgun shell casing was recovered in front of 106 Appleton Street; a second was found in front of 120 Appleton Street; and a third in front of 151 Appleton Street.

[18]The license had expired on Brown's birthday two years before. The officer later learned from his dispatcher that Brown had a valid Massachusetts driver's license.

out of the vehicle. The officers asked Brown if they could search the van for drugs and weapons, and he assented. Inside they found a loaded shotgun and a spent shotgun shell.[19] Brown was placed under arrest for unlawful possession of a firearm and given Miranda warnings.[20]

Using the serial number on the shotgun, the officers determined that it had been purchased at Bob Smith's Sporting Goods and reported stolen to the Boston police by Bobbitt. The shotgun was later test fired for ballistic analysis. The marks on the casings matched those on the casings found on Appleton Street. In a subsequent search of the apartment where Brown lived, the police found an empty box of twenty-gauge shotgun shells on the floor of his bedroom bearing a price tag from Bob Smith's Sporting Goods. They also found a thigh-length green coat.

The defense proceeded principally on the theory that Brown was not criminally responsible for his actions because of severe mental disease. This involved presenting extensive expert testimony, as well as testimony from Brown's family and friends regarding their observations of his mental deterioration in the years leading up to the murders.

The primary defense witness was a forensic psychiatrist, whose observations were based on eight examinations of Brown (involving twenty-one hours), discussions with witnesses, and review of the records of other professionals. The expert opined that, at the time of the murders, Brown suffered from paranoid schizophrenia.[21] He exhibited many symptoms of this disease, including delusions, hallucinations, some disorganized speech, flat affect, and a loss of interest in friends, work, and social life. The expert testified that, even with these symptoms, those suffering paranoid schizophrenia are not completely impaired cognitively and maintain the capacity to do detailed planning.

---

[19]At trial, Bobbitt identified the weapon found in Brown's car as the one he had purchased for Brown and later reported stolen.

[20]Brown signed a waiver of his Miranda rights. The officer receiving the waiver testified that Brown appeared to understand the rights he had explained to him.

[21]Three other expert witnesses called by the defense — two psychiatrists and a psychologist, all employed at Bridgewater State Hospital — also testified. Each made the same diagnosis as the primary expert.

The expert further opined that Brown exhibited signs of schizophrenia as early as 1993. This included social withdrawal, moodiness, and decreased attention to personal hygiene. By 1995, Brown had become "grossly psychotic." As a result, Brown suffered a host of visual and auditory delusions. One of these involved a woman in a chariot called "Helen and the Hell Dogs" whom Brown thought was following him. Brown also believed that he had invented a ray gun and a perpetual motion machine that ran on magnets. At various times he also thought he was the Messiah or an "anti-Christ," and that he had to write important books. Brown also had delusions about a real estate deal in which he would construct one hundred three-family houses in Roxbury in association with a group called the Tribe of Judah.

Homophobic delusions were particularly prominent in Brown's schizophrenia.[22] These often involved a group of friends with whom Brown socialized and went to dance clubs. Brown became convinced that members of his social group were secretly homosexuals, in league with the devil, with an intent to "convert" him.[23] He also believed that he had a "special role" regarding "sexual immoralizers" related to the Bible and the government. Some of Brown's delusions were particularly graphic, involving homosexual violence and rape.[24]

According to the expert, Brown's homophobic delusions were particularly prominent around the time of the killings. He obtained the gun because the delusional voices in his head told him to kill the "sexual immoralizers"; and he went to the South End because "that's where the gays live." Brown told the defense expert during one interview that the voices in his head told him to kill two men, "one for Sodom, one for Gomorrah." When he saw Ol-

[22]The defense's primary expert testified that homophobic delusions are common in paranoid schizophrenics who have conflicts about their own homosexual impulses.

[23]In February, 1995, Brown was arrested in Miami, Florida. He told a doctor at the Dade County jail that he had come to Miami in order to flee the sexual assaults of his social group, and he recounted many of the delusions he later described to the defense expert. Brown was diagnosed with paranoid homophobic psychosis and forcibly medicated.

[24]The man who appeared most prominently in Brown's delusions was a member of Brown's social and dancing group. He testified that he had never had any contact with Brown of a sexual nature.

iveira, the voices said, "Let him be the first." As he moved down the street after the first shooting, the voices told Brown to "shoot some more." When he saw Meyer, Brown thought Meyer was "walking like a lady," and so the voices told him to "shoot him when he gets close." At another point Brown told the expert: "The gay people were sexual immoralizers. It was my job [to kill them] because I was communicating with the voices. When I would read the Bible almost every night, they would say, 'this is what we want you to do.' " When asked by the expert if he thought killing was not right, Brown told him, "I didn't think of that."

During another interview, Brown told the expert that on the night of the murders, he drank vodka and beer, and smoked marijuana. The voices then told him that it was time to kill the "sexual immoralizers." Brown told the expert that he asked one man he encountered if he were a homosexual. When that man said he was not, Brown moved on. When a second man — apparently Oliveira — answered, "Yes" to the question, the voices told Brown to shoot him. Brown said that he was scared but did not feel as though he had any choice but to shoot, otherwise the voices might kill him. The voices were saying repeatedly to him, "One for Sodom, one for Gomorrah." When Brown then encountered Meyer, he told the expert that he asked him if he were a homosexual. Meyer replied, "Yes," and the voices told Brown, "This is the second one. Shoot him." Brown then ran away and hid in an alley for an hour, afraid of harm from a higher power and convinced that it was the end of the world.

The expert further testified that, at the time of the shootings, Brown was in a state of extreme psychosis, with his delusions and hallucinations overwhelming his ability to control himself. This caused panic, extreme fear, and confusion. Consequently, in the expert's opinion, Brown lacked the substantial capacity to appreciate the legal wrongfulness or illegality of his actions; and he lacked substantial capacity to conform his conduct to the requirements of law.[25] The expert also opined that Brown was not malingering, and that he had no nonpsychotic motive to kill the victims.

---

[25]In *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-447 (1967), we adopted the Model Penal Code's formulation for the insanity defense: "A person is not responsible for criminal conduct if at the time of such conduct as a result of

Two of Brown's family members testified to his mental deterioration. His older brother testified that between 1995 and June, 1996, Brown's dress changed from neat to sloppy. He became angry and confrontational. He told his brother that there were people after him. Between October, 1994, and March, 1995, Brown lived with a female cousin. She testified that, beginning in January, 1995, Brown became withdrawn, often staying in his room playing loud music. His dress and grooming habits deteriorated, and Brown became irritable and hostile.

Members of Brown's social group also observed a change in him. When he first began associating with them, Brown was well groomed, well dressed, and in good physical shape. He was a particularly talented dancer. By early 1995, though, Brown had dropped out of his dancing group without explanation. In the fall of that year, one member of the group passed Brown in the street, but Brown did not seem to recognize him. Brown appeared in total disarray, with bulging eyes, dirty clothes, and a scraggly beard.

Bobbitt testified[26] that, in December, 1995, Brown asked him to drive with him to Philadelphia and back.[27] Throughout the trip, Brown asked Bobbitt repeatedly to look behind their vehicle to see if they were being followed. Brown repeatedly said, "I wish you mother fuckers would stop following me." Bobbitt also observed Brown "having a conversation with the radio." The conversation seemed nonsensical to Bobbitt. Brown did not, however, have any difficulty driving the vehicle. On the return trip the two men were arrested in Pembroke, New Jersey, after Brown made an illegal U-turn in front of a police car.

Two of Brown's former employers also testified. Beginning in May, 1991, Brown worked as a technician in a laboratory at Massachusetts General Hospital (MGH). He did well in the job,

---

mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Id.*, quoting Model Penal Code § 4.01 (Proposed Official Draft 1962).

[26]Bobbitt was called as a witness by the Commonwealth during its case-in-chief; however, the defense elicited testimony on cross-examination that it later argued supported Brown's insanity defense.

[27]The defense expert testified that Brown made this trip in response to the delusional voices he was hearing.

improved his skills, and seemed popular with his coworkers. By December, 1994, Brown had become more "disheveled" than before, and eventually he quit the job. He told his employer that he was going to work on home renovations with his brother.[28] In December, 1995, Brown was hired to work in another laboratory at MGH. By March, 1996, Brown was arriving late to work and not completing his assignments. Then, in May, 1996, Brown became drunk and behaved badly at a party held for laboratory staff. Brown was asked for his resignation.

In rebuttal, the Commonwealth called its own expert, a psychiatrist in private practice, whose testimony continued over three days. He opined that Brown did not suffer from a psychotic illness on the day of the killings. In his opinion, Brown did not lack the substantial capacity to appreciate the wrongfulness of his conduct or to conform his behavior to the requirements of law. Based on a test he gave Brown, the Commonwealth's expert testified that Brown might have been malingering. A defense surrebuttal expert who examined the same test results reached a different conclusion, and testified that Brown was not malingering.

3. *Competency to stand trial.* Brown argues that the judge's pretrial rulings on his competency deprived him of a fair trial. He asserts that the competency hearing was "constitutionally inadequate" because the judge only ordered an "examination" under § 15 (*a*) yet refused to order "observation and further examination" under G. L. c. 123, § 15 (*b*), at Bridgewater prior to the hearing.[29] He also asserts that his hearing was inadequate because the judge refused to order the production of Brown's Bridgewater medical records and the tape recording of the District Court hearing held pursuant to *Rogers* v. *Commissioner of the Dep't of Mental Health,* 390 Mass. 489, 494-499 (1983) (*Rogers* hearing), see note 7, *supra,* for use at the competency

---

[28]The defense expert testified that Brown quit his job at the laboratory because of his delusion about the "Tribe of Judah," involving construction of one hundred three-family residences in Roxbury.

[29]The docket indicates that Brown filed motions for observation and examination pursuant to G. L. c. 123, § 15 (*b*), on February 28, 2001, and March 12, 2001. There is no indication that the judge took action on the first motion, and the second motion was denied after a hearing. During the competency hearing, on March 20, 2001, defense counsel again moved for a § 15 (*b*) examination, which the judge denied.

hearing. He also asserts that the evidence of competency was insufficient to satisfy the Commonwealth's burden. We disagree with each of his contentions.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Commonwealth* v. *Crowley*, 393 Mass. 393, 398 (1984), quoting *Drope* v. *Missouri*, 420 U.S. 162, 171 (1975). See *Medina* v. *California*, 505 U.S. 437, 439 (1992) ("It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial"). General Laws c. 123, § 15, provides the framework for a court to ensure that a defendant is competent prior to bringing him to trial. Section 15 (*a*) states that "[w]henever a court of competent jurisdiction doubts whether a defendant in a criminal case is competent to stand trial . . . it may . . . order an examination of such defendant to be conducted by one or more qualified physicians or one or more qualified psychologists." After the § 15 (*a*) examination, "the court may order that the person be hospitalized at . . . Bridgewater state hospital . . . for observation and further examination, if the court has reason to believe that such observation and further examination are necessary in order to determine whether mental illness or mental defect have so affected a person that he is not competent to stand trial." G. L. c. 123, § 15 (*b*). If the court is not satisfied that the defendant is competent to stand trial, "the court shall hold a hearing on whether the defendant is competent to stand trial." G. L. c. 123, § 15 (*d*).

A judge's determination of competency is entitled to substantial deference "because the judge had the opportunity to view the witnesses in open court and to evaluate the defendant personally." *Commonwealth* v. *Prater*, 420 Mass. 569, 574 (1995). The test for competency to stand trial is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.' " *Commonwealth* v. *Crowley*,

*supra,* quoting *Dusky* v. *United States,* 362 U.S. 402, 402 (1960). The Commonwealth must prove by a preponderance of the evidence that the defendant is competent to stand trial. *Commonwealth* v. *Crowley, supra* at 400.

Brown suggests that the court "simply bypass[ed] the step of sending [him] to Bridgewater for evaluation when a serious question regarding [his] competency remain[ed]" after the § 15 (*a*) evaluation. However, the language of G. L. c. 123, § 15 (*b*) ("the court *may* order that the person be hospitalized" [emphasis added]) is permissive rather than mandatory. See *Commonwealth* v. *Lameire,* 50 Mass. App. Ct. 271, 276 (2000) (judge may decide competency question after receiving report of § 15 [*a*] evaluation). See also *Wiedmann* v. *Bradford Group, Inc.,* 444 Mass. 698, 709-710 (2005) (term "may" is permissive rather than mandatory). At the time he requested the § 15 (*b*) examination, Brown had been committed to Bridgewater for several years pursuant to § 18 (*a*), and evaluations of him had already been filed with the court periodically during that commitment. We find no support in the record for Brown's assertion that the trial judge declined to order a "necessary [15 (*b*)] evaluation" because of his "desire to avoid delay or to punish the defendant for voluntarily going off his medication." The judge's decision to rule on Brown's competency based on the § 15 (*a*) evaluations and the extensive psychiatric testimony at the competency hearing was not an abuse of discretion and it did not make the judge's subsequent determination of competency "fundamentally flawed." See *Commonwealth* v. *Lameire, supra* at 276-277 (no abuse of discretion where judge relied on psychologist's preliminary examination of defendant for competency determination, without ordering § 15 [*b*] evaluation).

In addition, the judge's refusal to order the production of Brown's Bridgewater medical records and the tape recording of the *Rogers* hearing did not render the hearing constitutionally inadequate. The competency hearing was four days long and included the testimony of four witnesses — two of whom testified regarding their observations of Brown at Bridgewater and his treatment while committed there. One of the witnesses testified about the *Rogers* hearing, including the resulting court

order and the fact that Brown subsequently resumed taking his medications. Admission of the Bridgewater medical records and the tape recording of the hearing would have been cumulative of this testimony.

Finally, we turn to the judge's substantive conclusion that Brown was competent to stand trial. The judge credited the testimony of the Commonwealth's expert, which included discussion of Brown's medical history, the witness's comprehensive psychiatric evaluation of Brown, and the witness's conclusion that Brown was competent to stand trial. The judge also noted Brown's conduct and demeanor during the proceeding and his interaction with his attorneys, observing that he "was attentive and appeared at all times to interact appropriately with defense counsel." Although Brown is correct that a defendant's demeanor is not dispositive of the issue of competency, it is a relevant factor, see *Commonwealth* v. *Lameire, supra.* The judge was not obliged to accept the testimony of other experts who opined that the defendant was not competent. See *Commonwealth* v. *Prater, supra* at 575, and cases cited. The evidence the judge found credible sufficed to meet the Commonwealth's burden, and support the judge's finding of competency.[30] *Id.*

4. *Sufficiency of the evidence.* At the close of the Commonwealth's case, Brown moved for required findings of not guilty on all charges. The motions were denied after hearing. On appeal, Brown challenges this ruling, arguing that the evidence was insufficient to support the guilty verdicts. We disagree.

In reviewing the denial of a motion for a required finding of not guilty, we must determine whether the evidence, viewed in its light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact that each element of the crime had been proved beyond a reasonable doubt. Our analysis asks not whether the evidence requires a finding of guilt, but whether it permits such a finding beyond a reasonable doubt. *Commonwealth* v. *Platt*, 440 Mass. 396, 400-401 (2003). Accord

---

[30]The judge explicitly noted in his written memorandum that the burden of proof was on the Commonwealth. Contrast *Commonwealth* v. *Crowley*, 393 Mass. 393, 400 (1984) (reversal warranted where "[i]t is not clear from the record . . . whether the judge placed the burden of proving competency on the prosecution, as is appropriate").

*Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Because the motions were made at the close of the Commonwealth's case, before the defense presented its evidence, we consider only the evidence admitted when the motions were filed — that is, only the Commonwealth's case-in-chief.[31] *Commonwealth* v. *Berry*, 431 Mass. 326, 330 (2000). *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976).

On the basis of that evidence, the jury could have found that Brown, with the help of Bobbitt, obtained a twenty-gauge shotgun and ammunition on Saturday, June 15, 1996; that he fired the gun several times in front of his residence in Roxbury at approximately 2 A.M. on Sunday, June 16, 1996; and that, after evading the police who responded to the fired shots, he left his residence with the shotgun and went to the South End. The jury could have found further that Brown was the man who encountered Oliveira in front of 106 Appleton Street in the South End at approximately 3:30 A.M.; that he fired the shotgun twice at Oliveira, killing him; that he then ran down Appleton Street and across Dartmouth Street, encountering Meyer near 131 Appleton Street; that Brown shot Meyer in the back of the head, killing him instantly; and that he then fled by continuing down Appleton Street toward West Canton Street. The jury were also warranted in concluding that Brown obtained the gun intending to use it for the "business" of killing, and that he approached and shot each victim deliberately, without provocation, and at close range, intending to cause death.

In sum, based on the evidence in the Commonwealth's case-in-chief, it was both reasonable and possible for the jury to find beyond a reasonable doubt that Brown murdered Oliveira and Meyer, and that he did so with deliberate premeditation. Accordingly, the judge properly denied the motions for required findings of not guilty.

5. *Purported introduction of postarrest silence.* Following his

---

[31]This point is of particular importance in this case because the defense, which sought to negate Brown's criminal responsibility on the basis of mental disease, effectively constituted an admission that Brown killed Oliveira and Meyer. Because the defense case is not considered, we also do not consider whether it caused deterioration of the Commonwealth's case. See *Commonwealth* v. *Pike*, 430 Mass. 317, 323 (1999) (deterioration occurs when Commonwealth's evidence shown to be incredible or conclusively incorrect).

arrest in Lincoln, Brown was interrogated by a police lieutenant. Brown told the lieutenant essentially what he had told the arresting officer: that he had dropped two girls off in Winchester and was returning home. After discussing this with Brown, the lieutenant "asked him if he had anything further to add to his statement that he had given to the officers during the night. And he responded, 'no, he did not.' " Brown claims that by eliciting this testimony, the prosecutor impermissibly introduced evidence of his postarrest silence. Because there was no objection at trial, our review asks whether any error created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 690 (1983) (*Mahdi*).

A defendant's decision to remain silent during postarrest custodial interrogation cannot be used against him at trial, and the provision of Miranda warnings involves an implicit assurance that a defendant's exercise of his rights will not penalize him at trial. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 657 (2000), and cases cited. Contrary to Brown's characterization, the lieutenant's testimony that Brown had nothing further to say merely indicated that Brown's statement to him was complete. This did not constitute an assertion by Brown of his right to remain silent. See *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991) (defendant's statement that "he had nothing else he could say" did not amount to invocation of right to remain silent). Indeed, Brown had already waived his Miranda rights, told the lieutenant that he was aware of his rights and of the waiver, and answered the lieutenant's questions.

Similarly unavailing is Brown's challenge to a question concerning the lieutenant's interrogation posed by the prosecutor to the Commonwealth's rebuttal expert. Over the course of his examination, the expert was asked a range of questions about various pieces of evidence and whether they were significant in the formation of his opinion of criminal responsibility. Specifically, the prosecutor asked the expert if it were significant to him that the lieutenant had a "conversation regarding [his Miranda waiver] with Mr. Brown on the early morning of June twenty-sixth of 1996 and that [Brown] acknowledged understanding each of those rights and that he thereafter signed or read and then signed [the waiver form]?" Brown argues that

this testimony, which was intended to undermine the insanity defense, led to an impermissible inference that Brown's "exercise of the right to remain silent is inconsistent with insanity." See *Mahdi, supra* at 695 ("Fundamental unfairness results from the use of evidence of such silence regardless whether the person exercising his or her constitutional right to remain silent claims insanity as a defense").

This testimony does not involve the exercise of the right to remain silent, which Brown waived, or the improper use at trial of the exercise of such a right. Rather, the prosecutor's question properly focused on Brown's apparent comprehension of the content of what the lieutenant said to him,[32] and as such was relevant to the question of his sanity. *Mahdi* protects the exercise of rights, not the understanding of their content.

6. *Voluntariness of statements.* In the Commonwealth's case-in-chief, statements that Brown made between June 15 and June 26, 1996, were introduced through the testimony of various civilian and police witnesses. The defense did not object to the admission of these statements on voluntariness grounds either pretrial[33] or at the time of their admission.[34] On the tenth day of trial, once the defense case was underway, the Commonwealth filed a motion requesting that the judge rule that certain statements already admitted in evidence were voluntary.[35] Defense counsel asked the judge to wait before ruling on the voluntari-

---

[32]The question to the rebuttal expert was one in a long line that recited portions of the evidence and asked the expert if they were significant. Even were we to find some error in the question about the lieutenant's interrogation of Brown, it would not approach a substantial risk of a miscarriage of justice. Significantly, in his summation, which included an extended attack on Brown's insanity defense, the prosecutor made no mention of Brown's waiver of his Miranda rights.

[33]Prior to trial, Brown had filed a motion to suppress, inter alia, his statements to the police as fruits of an unlawful search of his automobile. Brown did not raise the issue of the voluntariness of his statements in the motion. The judge, however, briefly discussed the voluntariness of one of Brown's statements to the police in his written memorandum denying the motion, noting that Brown failed to offer any evidence that the statement was involuntary, and concluding that Brown spoke voluntarily.

[34]Brown did object to the admission of some of these statements on hearsay grounds. These objections were correctly overruled.

[35]The Commonwealth specifically listed statements to Bobbitt on June 15, 1996; Bobbitt and Jada Hill on June 16; Bobbitt on June 16 or June 17; Sam-

ness of the statements until after he had heard psychiatric testimony whether Brown was suffering from a mental illness. The judge declined to delay his ruling, and ruled, over objection, that the Commonwealth had proved beyond a reasonable doubt that each of the enumerated statements was made freely, willingly, and voluntarily. At the conclusion of the trial, the judge provided a "humane practice" instruction to the jury pertaining to all of Brown's statements. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-152, cert. denied, 457 U.S. 1137 (1982) ("humane practice" instruction provides that jury should not consider defendant's confession or admission unless jury are satisfied that it was voluntary act). Brown argues here that the judge's failure to hold a voir dire on the voluntariness of these statements deprived him of a fair trial. We reject this claim.

"It is . . . fundamental that a confession, or . . . an admission, whether made to police or to a civilian, is admissible only if it is voluntarily made." *Commonwealth* v. *Sheriff*, 425 Mass. 186, 192 (1997). See *Jackson* v. *Denno*, 378 U.S. 368, 376 (1964); *Commonwealth* v. *Brady*, 380 Mass. 44, 48 (1980). "Statements that are attributable in large measure to a defendant's debilitated condition, such as insanity . . . are not the product of a rational intellect or free will and are involuntary." *Commonwealth* v. *Hunter*, 416 Mass. 831, 834 (1994), *S.C.*, 427 Mass. 651 (1998), quoting *Commonwealth* v. *Allen*, 395 Mass. 448, 455 (1985). When a defendant raises the issue of voluntariness, the judge must conduct a voir dire out of the jury's presence to determine whether the statements in question were voluntary. *Commonwealth* v. *Brady*, *supra*. If the defendant does not raise the issue of voluntariness, the judge has a sua sponte obligation to conduct a voir dire only if the voluntariness of the statements is a live issue such that there is evidence of a "substantial claim of involuntariness." *Commonwealth* v. *Stroyny*, 435 Mass. 635, 646 (2002). See *Commonwealth* v. *Murphy*, 426 Mass. 395, 398 (1998). If a substantial issue of involuntariness is raised, a judge's conclusion that a defendant's

uel Lewis on June 18; Lewis, Bobbitt, and Michael Holman on June 19; and Officers Richard McCarty and Randall Azzato and Lieutenant Kevin Mooney on June 26.

statements are voluntary beyond a reasonable doubt "must appear from the record with unmistakable clarity." *Commonwealth v. Tavares, supra* at 152, quoting *Sims v. Georgia,* 385 U.S. 538, 544 (1967). "In looking at the totality of the circumstances to determine the voluntariness of a statement, the judge may consider, among other things, the defendant's age, education, intelligence, physical and mental stability, and experience with and in the criminal justice system." *Commonwealth v. Anderson,* 445 Mass. 195, 203 (2005).

As a threshold matter, we note that the statements Brown made to Bobbitt prior to the shootings are not subject to a voluntariness analysis, because the purchase of the gun was part and parcel of the crime. As we said in *Commonwealth v. Boateng,* 438 Mass. 498, 504 (2003), "While the rule [requiring voluntariness hearings] covers statements made by defendants to private parties in the aftermath of their criminal conduct . . . we have never applied it to statements made by a defendant during the commission of his crime." Accord *Commonwealth v. Netto,* 438 Mass. 686, 699 (2003). With respect to the remainder of Brown's statements, we conclude that the judge did not err in failing to conduct a voir dire hearing sua sponte.

Brown concedes that he did not raise the issue of voluntariness prior to trial or at the time of the admission of the statements.[36] He argues instead that voluntariness "was clearly a live issue in light of [Brown's] evidence of mental illness." However, when a defendant raises an insanity defense, the voluntariness of all his statements does not automatically become a live issue. See, e.g., *Commonwealth v. Benoit,* 410 Mass. 506, 515 (1991) (no live issue of voluntariness where judge lacked substantial evidence of defendant's insanity at time he made statements). When the statements were admitted in evidence there was no substantial claim that at the time they were made Brown was suffering from the effects of mental illness and that the statements were attributable in large measure to that mental illness. The testimony during the Commonwealth's case-in-chief was that Brown appeared to

[36]Brown's motion to suppress, see note 33, *supra,* which challenged statements made by Brown to the police as fruits of an unlawful search, did not serve to raise the issue of their voluntariness. See *Commonwealth v. Benoit,* 410 Mass. 506, 509-510 (1991).

understand what was said to him and that the witnesses who testified to his statements did not have trouble understanding him. See *Commonwealth* v. *Benoit, supra* at 514. Defense counsel's strategy with respect to the statements was to question whether they, in fact, had been made, rather than challenging their voluntariness.[37]

To the extent that the voluntariness of Brown's statements became a live issue after their admission (during the defense case), the judge properly submitted the voluntariness issue to the jury by providing the humane practice instruction. See *id.* at 512 ("if the voluntariness of a confession or admission remains a live issue after evidence of the confession or admission has been presented to the jury, then the 'humane practice' of Massachusetts dictates that the judge instruct the jury that they may consider the voluntariness of the confession or admission and reject any statements which they consider involuntary"). See *Commonwealth* v. *Girouard,* 436 Mass. 657, 667 (2002) (whether defendant's mental disability affected voluntariness of his statements properly left for jury's determination where "it was only during the defendant's presentation of his case at trial that he proffered evidence on this issue, namely, testimony from his expert witness who had performed a psychological evaluation of the defendant").

Finally, we address Brown's contention that the Commonwealth did not meet its burden of proving the voluntariness of his statements beyond a reasonable doubt. The judge found that the Commonwealth had met this burden, even though he did not conduct (nor was he required to conduct) a voir dire. The finding, even if not required in this case as a predicate to the admission of the statements, was requested by the Commonwealth. It is supported by testimony that at the time Brown made statements to his friends he did not appear to have any trouble understanding questions posed to him nor did they have any trouble understanding him, see *Commonwealth* v. *Cryer,* 426 Mass. 562, 566 (1998) (judge's conclusion that defendant's confession voluntary supported by testimony of interrogating officers that "defendant appeared sober and coher-

---

[37]See *Commonwealth* v. *Zagrodny,* 443 Mass. 93, 97 (2004) ("when a defendant has made a considered and tactical decision not to challenge voluntariness, the judge need not obstruct that strategy by conducting a voir dire").

ent, that he did not appear to have any problems understanding them, and that they had no problems understanding him"), and, with respect to the statements made to police officers, by testimony that Brown signed two Miranda waivers after appearing to understand the rights they conveyed. See *id.*[38]

7. *Intoxication instruction.* The judge refused to instruct the jury on intoxication, as requested.[39] Brown argues that this constituted error. "An instruction on voluntary intoxication is not required absent evidence of 'debilitating intoxication.' " *Commonwealth* v. *Chaleumphong*, 434 Mass. 70, 78 (2001), quoting *Commonwealth* v. *Erdely*, 430 Mass. 149, 152 (1999). Such evidence must support the inference that, "at the time of the killing, intoxication impaired the defendant's ability to form any requisite criminal intent." *Commonwealth* v. *Moses*, 436 Mass. 598, 603 (2002). See *Commonwealth* v. *Thomas*, 448 Mass. 180, 188-189 (2007) (judge's refusal to provide intoxication instruction not error where there was no evidence of defendant's intoxication at time of killing).

Neither Bobbitt nor any other witness who was in Brown's company prior to the murders testified that Brown either consumed or appeared debilitated by the consumption of intoxicating substances. Consequently, in support of his argument, Brown points to the testimony of his psychiatric expert that Brown stated to him that prior to the shootings Brown had smoked marijuana and ingested vodka and beer. However, as the judge instructed the jury, this testimony was admitted only as a basis for the expert's opinion, not for the truth of the underlying statements. See *Commonwealth* v. *Jaime*, 433 Mass. 575, 577-578 & n.1 (2001) (judge instructed jury that expert could testify to basis of his opinion but that where basis constituted statements of other people, those statements were "not admitted for the truth"); *Simon* v. *Solomon*, 385 Mass. 91, 106 (1982) (psychiatric

[38]Because we hold that the judge's ruling of voluntariness was based on adequate findings of fact, we reject Brown's claim that the prosecutor's use of his statements in closing argument constituted error.

[39]Although defense counsel submitted written requests for a number of instructions, including an instruction on intoxication, he did not raise or argue for the intoxication instruction at the charging conference (in which other contested instructions were discussed at some length); nor did he suggest in his closing argument that Brown was intoxicated at the time of the murders.

witness's testimony about facts that were the basis of his opinion, which was "admitted for the limited purpose of laying the foundation for his opinion," was proper). Similarly, the testimony of the Commonwealth's expert that Brown stated that he had been drinking prior to the shootings and that Brown was drinking excessively in the months leading up to the murders is based on hearsay that was not admitted as substantive evidence. In addition, none of this evidence — or any other evidence admitted at trial — demonstrated how much or for how long Brown had been drinking on the night of the shootings or what effect any alcohol that he may have ingested had on him, see *Commonwealth* v. *Chaleumphong, supra* (no evidence of debilitating intoxication where there was testimony that defendant was not drunk even though there was evidence he may have consumed alcohol), or whether his ability to form the requisite criminal intent was impaired, see *Commonwealth* v. *Moses, supra* (even though there was testimony that defendant had been drinking and smoking marijuana, judge correctly refused to instruct on intoxication where there was no evidence showing that intoxication impaired defendant's ability to form requisite criminal intent). On this record, the evidence did not warrant or require an instruction on intoxication, and the judge did not err in declining to give it.[40,41]

8. *Exclusion of certain of Brown's psychiatric records.* At trial, the judge refused to admit in evidence Brown's Bridgewater medical records.[42] Brown argues that this exclusion constituted error, and that it violated his right to present a defense under the

---

[40]Because we conclude that an intoxication instruction was not warranted, we reject Brown's argument that the judge's failure to provide an intoxication instruction relieved the Commonwealth of a portion of its burden of proof in violation of his right to due process under the State and Federal Constitutions.

[41]The defense correctly points out that the Commonwealth suggested in closing argument that Brown might have been "abusing alcohol and abusing marijuana" on the night of the shootings. Although Brown does not raise this as error, we examine it in the context of our review under G. L. c. 278, § 33E, see *Commonwealth* v. *Passley*, 428 Mass. 832, 834-835 (1999), and conclude that, to the extent the argument was improper, it did not create a substantial likelihood of miscarriage of justice. See *Commonwealth* v. *Bregoli*, 431 Mass. 265, 278 (2000) (although prosecutor's argument was improper where he used evidence substantively in closing argument that was admitted only for limited purpose, any effect was minimal).

[42]Brown contends that his Bridgewater records were admissible under

Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, specifically his right to "place before the jury any evidence which is at all probative of his mental condition," *Commonwealth* v. *Louraine*, 390 Mass. 28, 34 (1983). We disagree.

"In the face of 'legitimate demands of the adversarial system,' " the right to present a defense "may be tempered according to the discretion of the trial judge." *Commonwealth* v. *Carroll*, 439 Mass. 547, 552 (2003), quoting *Commonwealth* v. *Edgerly*, 372 Mass. 337, 343 (1977). The judge may exclude evidence that is "cumulative, repetitive, or confusing." *Commonwealth* v. *Carroll, supra* at 553, quoting *Commonwealth* v. *Durning*, 406 Mass. 485, 495 (1990). See *Commonwealth* v. *Talbot*, 444 Mass. 586, 590 (2005) ("judge did not abuse his discretion, or deny the defendant's rights to present a defense . . . under art. 12 of the Massachusetts Declaration of Rights or the Sixth Amendment to the United States Constitution, by excluding testimony that essentially was cumulative"). Here, Brown introduced extensive evidence at trial about his mental condition during the period in which he was hospitalized at Bridgewater, including the detailed testimony of four expert witnesses pertaining to observations, evaluations, and the treatment of Brown during his commitment to Bridgewater. The Bridgewater medical records would have been cumulative of this evidence.[43] The judge did not abuse his discretion in excluding the records and there was no constitutional violation.

*9. Exclusion of students from jury.* Of the 155 members of the venire, twenty-four were college students. The judge excluded all of them on grounds of hardship. Of these, only three asked for a hardship excuse without prompting. The judge specifically suggested to twelve of the students that their service

---

G. L. c. 233, § 79, which provides that "[r]ecords kept by hospitals . . . may be admitted by the court, *in its discretion*, as evidence in the courts of the commonwealth so far as such records relate to the treatment and medical history of such cases" (emphasis added).

[43]Based on our review of the trial transcript and the Bridgewater medical records that were offered but not admitted in evidence, we reject Brown's argument that the experts who testified at trial were unable to summarize the Bridgewater records through testimony and that the jury's access to the records while deliberating was essential.

would create a hardship after they had initially indicated that they were not seeking a hardship excuse.[44] Brown argues that this exclusion of students from the jury deprived him of a fair trial. Neither party objected to the exclusion of any specific student or to the exclusion of students generally. Accordingly our review is under the substantial likelihood of a miscarriage of justice standard.

The Sixth Amendment to the Federal Constitution and art. 12 of the Declaration of Rights require that a jury be "drawn from a source fairly representative of the community." *Commonwealth* v. *Bastarache*, 382 Mass. 86, 96 (1980) (*Bastarache*), quoting *Taylor* v. *Louisiana*, 419 U.S. 522, 538 (1975) (*Taylor*).[45] We have previously rejected the argument that col-

---

[44]The following exchange is representative of the judge's questioning of students in the venire:

THE JUDGE: "What school do you go to?"

THE JUROR: "Northeastern University."

THE JUDGE: "All day?"

THE JUROR: "Yes."

THE JUDGE: "Every day?"

THE JUROR: "Um-humh."

THE JUDGE: "Are you looking for an excuse for that reason?"

THE JUROR: "No."

THE JUDGE: "You're not looking for an excuse?"

THE JUROR: "Well . . ."

THE JUDGE: "No; I just want to know, because a lot of full-time students say they can't serve because they're students."

THE JUROR: "Well, yes; I go all the time."

THE JUDGE: "Well, let me try it again. If you go to school full time, you can't be here at the same time, correct?"

THE JUROR: "Yes."

THE JUDGE: "Therefore, are you asking the court to be excused for that reason?"

THE JUROR: "Yes."

THE JUDGE: "Excused."

[45]Although the challenges in both *Commonwealth* v. *Bastarache*, 382 Mass. 86, 96 (1980), and *Taylor* v. *Louisiana*, 419 U.S. 522, 538 (1975), involved jury lists, their teaching applies equally to systematic exclusion of members of a group who actually appear at a venire — that is, who are on the jury list, but then are systematically not seated based on group membership. *Duren* v.

lege students constitute a distinctive group for purposes of the fair cross section analysis required by *Bastarache, supra,* and *Taylor, supra. Commonwealth* v. *Evans,* 438 Mass. 142, 149, cert. denied, 538 U.S. 966 (2003) (*Evans*). Brown offers no legal argument that would cause us to reconsider that conclusion, nor does he point to any evidence suggesting that the jury pool was not otherwise "fairly representative of the community." Consequently, to the extent that the judge's exclusion of students was improper, we do not conclude that it created a substantial likelihood of a miscarriage of justice here.

We do agree, however, that the judge's exclusion of students, insofar as it was systematic, was improper. In *Evans, supra* at 149, we approved a judge's exclusion of students on the ground of hardship insofar as it "was based on individual circumstances and not on the basis of any policy, and that the decision in each instance was within the judge's discretion under G. L. c. 234A, § 40 (trial lasting more than three days may be ground to excuse juror for hardship)." In contrast, in this case the judge's decision to exclude students without an individualized finding of hardship is apparent. Only three of the students in the venire asked for a hardship excuse. The rest were excused without discussion, or directly prompted by the judge to ask for such an excuse (which was then granted). The exclusion of students without an individualized finding of hardship violates G. L. c. 234A, § 3 ("No person shall be exempted or excluded from serving as a grand or trial juror because of . . . occupation"). Students are not to be excluded simply by virtue of their occupation. As with any other hardship excuse, those for students must be based on an individualized finding and not a blanket rule.

10. *Review under G. L. c. 278, § 33E.* In addition to our consideration of the issues raised by the parties in this appeal, we have independently reviewed the entire record of the case as required by G. L. c. 278, § 33E. Brown asks that we exercise our extraordinary power under that section to reverse his convictions and grant him a new trial. In support he cites the extensive evidence of his mental illness, suggesting that the jury should have returned a verdict of not guilty by reason of insanity.

*Missouri,* 439 U.S. 357, 364 (1979).

While Brown did present substantial evidence supporting his insanity defense, our task is not to determine whether the verdicts are those we would have returned, but whether they are consonant with justice. Review under G. L. c. 278, § 33E, does not "convert this court into a second jury." *Commonwealth* v. *Smith*, 357 Mass. 168, 181 (1970), quoting *Commonwealth* v. *Gricus*, 317 Mass. 403, 406-407 (1944). The insanity defense was fully and fairly presented to the jury, and the Commonwealth offered evidence in rebuttal. The judge's instructions to the jury about the insanity defense were correct, comprehensible, and comprehensive. In similar cases, we have concluded, "Since the issue of the defendant's criminal responsibility was fully and fairly before the jury . . . justice does not require that their verdict be disturbed." *Commonwealth* v. *Lunde*, 390 Mass. 42, 50 (1983), citing *Commonwealth* v. *Marshall*, 373 Mass. 65, 72 (1977). Accord *Commonwealth* v. *Lo*, 428 Mass. 45, 54-55 (1998) (jury's rejection of insanity defense not grounds for relief under G. L. c. 278, § 33E). Contrast *Commonwealth* v. *Mutina*, 366 Mass. 810, 815 (1975) (relief warranted when Commonwealth presented no independent evidence bearing on criminal responsibility, relying only on presumption of sanity). We see no basis for concluding differently here.

*Judgments affirmed.*